THE BOARD OF REGENTS OF THE STATE SOLDIERS' AND
SAILORS' MONUMENT *v.* DAILY, AUDITOR
OF STATE.

[No. 18,472.    Filed June 15, 1898.]

SOLDIERS' MONUMENT.—*Statutes Construed.—Expenses of Decoration of Monument.—From Which Fund Paid.*—Under the act of March 4, 1893 (Acts 1893, p. 305), re-appropriating the funds provided by the act of March 7, 1891, for the completion and decoration of the soldiers' and sailors' monument, construed with the act of March 6, 1895 (Acts 1895, p. 134), which substitutes a board of regents for the commissioners, and provides that they shall serve without pay, except necessary expenses, and an annual salary of $1,500.00 to the president, to be paid out of the general fund of the State; the clay models from which the decorations of the monument known as the "Peace" and "War" groups, and the pumps and engines to operate the fountains, which were parts of the original plan for the construction of the monument, are essentials, and not merely incidental to the completion and decoration of the monument, and payment

therefor cannot be made out of the general fund of the State, but must be paid out of the "monument fund" created by the special act.

From the Marion Circuit Court.   *Affirmed.*

*A. G. Smith,* and *C. A. Korbly,* for appellants.

*W. A. Ketcham,* Attorney-General, for appellee.

HOWARD, J.—By an act approved March 3, 1887 (Acts 1887, p. 30), the General Assembly appropriated $200,000.00, "for the purpose of erecting a State Soldiers' and Sailors' Monument, said appropriation to be used in connection with such other funds as have already been, or may hereafter be, donated and contributed for said purpose."

By an act approved March 7, 1891 (Acts 1891, p. 341), an additional appropriation of $30,000.00 was made for the same purpose; and, by the same act, there was likewise appropriated the sum of five mills upon each one hundred dollars worth of taxable property in the State, to be assessed and collected in each of the years 1891 and 1892, as other taxes are assessed and collected; "which money," it was there provided, "when collected, shall be placed to the credit of, and known as the State Soldiers' and Sailors' Monument fund, and the same is hereby appropriated for the completion of said State Soldiers' and Sailors' Monument."

From the complaint, it appears that the funds realized from the five mills tax for 1891 and 1892 amounted to $123,168.84, making the total appropriation by the State $353,168.84.

By the third section of the act of 1891, the board of monument commissioners were required to give bond in the sum of $100,000.00, conditioned that they would complete the monument, "in every particular, without any further cost or expense to the State of Indiana."

By an act approved March 4, 1893 (Acts 1893, p. 305), section 3 of the act of 1891 was repealed, and the funds appropriated by the act were "re-appropriated for the completion and decoration of the said State Soldiers' and Sailors' Monument and surrounding grounds in such manner as the said board of commissioners may designate."

Finally, by an act in force March 6, 1895 (Acts 1895, p. 134), a board of three regents was substituted for the monument commissioners.    In this act it was provided that the regents should serve without pay, except that they should be reimbursed for their necessary expenses, and that the president of the board should receive a yearly salary of $1,500.00, "to be paid from any moneys in the State treasury not otherwise appropriated."    It was further provided that the regents should discharge all obligations incurred by their predecessors, the commissioners, "and carry to completion, as far as may be desirable and practicable, the work heretofore entrusted to their supervision and control, and in accordance with the laws under which they acted."

Relying upon the provisions of the several statutes above referred to, the board of regents brought their action in the Marion Circuit Court for a writ of mandate to require the Auditor of State, "to transfer several sums of money paid by the State of Indiana upon warrants issued by said defendant [the appellee, Auditor of State], namely $6,000.00 to Bruno Schmitz, of Berlin, Prussia, and $2,500.00 to the Connersville Blower Company—classified as merely incidental expenses—from the fund known as the 'Monument Fund,' and to charge the same to and against the fund known as the 'General Fund,' in the treasury of the State of Indiana; and further commanding the defendant herein to draw a warrant in favor of the Capi-

tal Machine Company of Indianapolis for three several installments of the contract price of the gas engines furnished by it for the State Soldiers' and Sailors' Monument, namely, the sum of $1,033.33 1-3 each, upon the fund known as the 'General Fund,' in the said State treasury, on account of the incidental expenses in the completion and operation of said monument; and further commanding the defendant herein to draw his warrant in favor of said Bruno Schmitz for two installments of $8,000.00 each, for the clay models, for the first and second groups, upon the fund known as the 'General Fund,' in the State treasury, upon the presentation, by said Capital Machine Works Company, and said Bruno Schmitz, respectively, of their respective certified accounts, and respective requisitions from said board of regents for such warrants, or show cause why the same should not be done."

To the alternative writ issued in compliance with the petition of the appellant, the appellee filed his answer and return, from which it appears that on or about the 22nd of May, 1896, the board of regents entered into contract with Bruno Schmitz, of Berlin, Prussia, to make and place in position upon the monument the groups of "War" and "Peace" and reliefs, according to designs and models accepted by the board, to be of the best Indiana oolitic limestone, and to be duly prepared and finished, and properly fitted and put in place upon the monument, and entirely completed by said Bruno Schmitz on the 1st day of August, 1898.

In the contract set out in the return, it is shown that Bruno Schmitz agreed "to do and furnish, or cause to be done and furnished, all incidental work of every kind, character and description relating to the making and putting in place, on said monument of said groups

of 'War' and 'Peace' and reliefs, including the boxing and packing," save only that the transportation of models was to be at the expense of the board. For all such work duly performed and materials furnished, and the groups of "War" and "Peace" and reliefs completed, mechanically and as works of art, delivered and put in place upon the monument to the satisfaction and approval of the board, Schmitz was to receive "as full compensation for the entire work the aggregate sum of $60,000.00," payable in stated installments as the work progressed.

The return also sets out the contract of the board with the Connersville Blower Company for the purchase, for $2,500.00, of two cycloidal rotary pumps; and avers that they were to be placed in the crypt of the monument, and used to pump water from the wells to the fountains on either side of the monument.

The contract with the Capital Machine Company for the purchase, for $3,100, of two gas engines, is also set out in the return; and it is averred that the engines were to be attached to the pumps aforesaid and so furnish power to supply water for the fountains. It is further averred that the fountains are a part of the original plan of the architect for the monument, and that the same are intended and designed to be and remain a permanent part of said monument and the decorations thereof. It is alleged in the writ, and is admitted in the return, that, of the amount appropriated for the construction and completion of the monument, there remains in the State treasury, to the credit of the monument fund, the sum of $70,327.09.

In the petition and writ it is alleged that the cost of the pumps and gas engines and also the first, second, and fourth items, or installments, of the sum of $60,000.00 paid, or to be paid, to Bruno Schmitz are incidental expenses of the building of the monument,

which should be paid out of the general fund in the State treasury, and not out of the monument fund. But in the answer and return it is averred that all these items are a part of the structural expenses of the monument; that said groups of "War" and "Peace" and reliefs are attached to, and are integral parts of the monument, and that the pumps and engines are also permanently affixed to the monument as essential parts of its decorations. Hence it is insisted in the answer and return that payments for all these items should be made out of the funds which were appropriated by the legislature for the construction and completion of the monument, and not out of the general fund of the State treasury. A demurrer to this return was overruled by the court, and, the appellants refusing to plead further, judgment was rendered against them. The only error assigned is the ruling on the demurrer.

The contract with Bruno Schmitz provided that the $60,000.00, to become due him for the groups of "War" and "Peace" and reliefs should be paid in nine installments, as follows: (1) At delivery of sketches, $6,000.00; (2) at completion in clay, one-third natural size, of first group, $8,000.00; (3) at completion of first group, in plaster of Paris, natural size, $7,000.00; (4) at completion, in clay, one-third natural size, of second group, $8,000.00; (5) at completion of second group, in plaster of Paris, natural size, $7,000.00; (6) at delivery and placing in position on monument of stone for first group, $5,000.00; (7) at delivery and placing of stone for second group, $5,000.00; (8) at completion of work on first group, $7,000.00; (9) at completion of second group, $7,000.00.

The contract was for the whole work; and it would seem that the payments were to be made in install-

ments, as the work progressed, merely for the convenience of the contractor and the security of the State. It is not easy to see any other distinction in the items, or why the first, second, and fourth should be picked out and called incidental, as appellants contend for, while the remainder should be considered as structural. The nine items were all equally essential to the completion of the whole work. The commissioners in allowing payment of the first item do not seem to have then regarded it as in any manner incidental. The certificate of the secretary shows that this item "was allowed and ordered to be charged to the account of construction by the board of commissioners of the State Soldiers' and Sailors' Monument, on the 23rd day of May, 1896." The order for the warrant, given by the president of the board for the same item, also shows that it was to be paid, not out of the general fund, as now demanded, but "out of the State Soldiers' and Sailors' Monument fund." We have read the record carefully, and also the brief of appellant, and have there sought in vain for any plausible reason to show that the view then entertained by the commissioners was not the correct one, and that the item was not for the construction of the monument, but incidental thereto, and hence not rightly paid out of the monument fund in the State treasury. The same original view entertained by the commissioners is shown in the orders of allowance and warrants for pumps purchased of the Connersville company. The accounts were "allowed and ordered to be charged to account of 'structural' by the board of commissioners;" and the president's orders for warrants were that payment for the pumps was to be "out of the State Soldiers' and Sailors' Monument fund."

The appellants, however, now contend that the action then taken was erroneous, and that the pay-

ments for pumps, gas engines, sketches of "War," "Peace" and reliefs, and completion of groups, in clay, one-third natural size, should have been made out of the general fund, and not out of the monument fund; for the reason, as we understand counsel, that these items were merely incidental, and were not essential to the structure, completion, and decoration of the monument. We confess to a total inability to understand this reasoning of the learned and able counsel for appellants. Since they went so far in their claim for incidentals, we are at a loss to know why they did not go further. If clay models, one-third natural size, are but incidentals in the work, why are not plaster of Paris models, full size, also incidentals? Those plaster of Paris models cost $7,000.00 for each group, and, if appellants' contention be tenable, we see no reason why they should not be claimed as incidentals, to be paid for out of the general fund in the State treasury, quite as well as the clay models. The plaster models have not actually gone into and formed a part of the structure of the monument, any more than the clay models. As we view the question, however, the doing of the work on the models, whether of clay or of plaster, was quite as much a part of the whole work committed to Bruno Schmitz as was the taking of the Bedford stone out of the quarry, the cutting, chipping, and polishing of the same, or any other preliminary work needed for the finishing and final placing in position of the noble groups and reliefs that are to adorn the great monument. None of the work is merely incidental; each and all is essential to the completion of the mighty whole.

Certain decisions of this court are cited in support of the contention that the items referred to should be classed as incidentals, and not as structural, expenses. The cases cited were of an unusual character, involv-

ing, as they did, extraordinary public interests, and even necessities. Cases of hardship sometimes result in extreme decisions; and we do not think that the rule said to have governed in the cases named, even if it were such as contended for, ought to be extended further than absolutely necessary. The controlling rule to be followed in such a case as that before us must be, that no money should be drawn from the public treasury except as expressly provided for in the act making the appropriation.

In the act of March 14, 1877, for the erection of the State-house (Acts 1877, Sp. Sess., p. 68), it was provided, amongst other things, that "when it becomes necessary they [the State-house commissioners] shall cause the old building to be removed, and they shall provide temporary quarters for the General Assembly, and for the officers now occupying the present building." The act contemplated the erection of the State-house at a cost not to exceed $2,000,000.00. In *Williams* v. *Mansur*, 70 Ind. 41, the question was whether, in view of those provisions of the act, the rent of the temporary quarters provided for some of the State officers should be paid out of the new State-house fund, or out of the general fund. It would seem that this rent was clearly an incidental expense, and that the authority given the commissioners to select such necessary quarters for the transaction of the business of the State was a sufficient appropriation for payment of the rent out of the general fund. The court, however, held that the rent should be paid out of the fund raised for the erection of the new State-house. The foregoing decision was somewhat modified in *Board, etc.,* v. *Whittaker*, 81 Ind. 297, where it was held "that it was the legislative intention, that the sum of $2,000,000.00 might be expended in the construction of the new State-house; and that, in ad-

dition thereto, all incidental expenses, such as salaries and traveling expenses of the board, compensation of architect, secretary and superintendent, rents, etc., may be paid out of the fund denominated the 'New State-house Fund.'"

In *Campbell* v. *Board, etc.,* 115 Ind. 591, it was held that the $200,000.00 appropriated by the act of 1887 for the erection of the Soldiers' and Sailors' Monument must "be devoted to the *structural* work of the monument, and hence not to merely incidental expenses, which do not enter into the cost value of the edifice, and which must be otherwise paid." The incidental expenses there in controversy were, "the salaries of such commissioners, the salary of their secretary, and other incidental expenses."

Following these cases, came *Henderson* v. *Board, etc.,* 129 Ind. 92, 13 L. R. A. 169, where it was held that the act of 1887, making the $200,000.00 appropriation for the monument, authorized, by implication the payment out of the general fund in the State treasury of incidental expenses connected with the building of the monument. The items there in controversy, and allowed as incidental expenses, were the following: Payment of architects, commissioners' per diem, traveling and hotel expenses, engineering, experts, attorneys, office and miscellaneous, secretary's salary, printing and stationery, superintendence, advertising, and removal of the Morton monument.

Without questioning the correctness of the foregoing decisions, we are unable to see that they have any application to the case before us. There is here no question of salary, or other expense regarded as incidental in those cases. Indeed it would seem that the last act of the legislature, *supra* (Acts 1895, p. 134), was expressly directed against the allowance of any incidentals, except as in the act itself particularly

mentioned.    It is provided in the fifth section of that act that the necessary expenses of the members of the board, and also a salary of $1,500.00 for the president, "be paid from any moneys in the State treasury not otherwise appropriated."    The legislature thus made an express appropriation out of the general fund for the payment of what were doubtless then regarded as the only incidental expenses likely to be incurred by the board.

It is at least certain, as we think, looking at all the acts of the legislature upon the subject, that the items of expense here in controversy cannot be regarded as incidental.    They are parts of the total cost of the monument, and to be paid for out of the fund appropriated by the General Assembly "for the completion and decoration of the said Soldiers' and Sailors' Monument and surrounding grounds in such manner as the said board of commissioners may designate."    The groups of "War" and "Peace" and reliefs are to be put in place in the monument, under a single contract, for .$60,000.00.    Every item of that contract is essential, and not incidental, to "the completion and decoration of the said Soldiers' and Sailors' Monument."    The fountains, too, are parts of the original plans of the architect for the "decorations of the said Soldiers' and Sailors' Monument and surrounding grounds;" and hence the pumps and engines, without which the fountains could not exist, are also essential, and not merely incidental, to the completion and decoration of the monument and grounds.    The items in controversy should therefore be paid out of the monument fund, and not out of the general fund in the State treasury.    Judgment affirmed.